247 P.3d 767 (2011)
240 Or. App. 738
FRIENDS OF YAMHILL COUNTY and Cheryl McCaffrey, Petitioners, and
Lee Does, Amy Does, Grace Schaad, and Ranee Solomonsson, Petitioners below,
v.
CITY OF NEWBERG, Respondent.
2010015; A146619.
Court of Appeals of Oregon.
Argued and Submitted November 23, 2010.
Decided February 16, 2011.
James S. Coon, Portland, argued the cause for petitioners. With him on the brief was Swanson Thomas & Coon.
Terrence D. Mahr, City Attorney, City of Newberg, argued the cause for respondent. With him on the brief was Corrine C. Sherton.
Before SCHUMAN, Presiding Judge, and WOLLHEIM, Judge, and ROSENBLUM, Judge.
SCHUMAN, P.J.
Petitioners seek review of a Land Use Board of Appeals (LUBA) decision regarding the City of Newberg's Economic Opportunities Analysis (EOA), a part of its comprehensive plan. Newberg originally adopted an EOA in January 2006. In February 2010, the city council passed, over petitioners' opposition, an ordinance adopting a revised and updated EOA. Petitioners appealed to LUBA, advancing six assignments of error. LUBA rejected some of those assignments but sustained others, resulting in a remand of the ordinance. Petitioners now seek review in this court of the assignments that LUBA rejected. We affirm, and write to address only one of those assignments.
*768 One function of an EOA is to allow local governments to "compare the demand for land for industrial and other employment uses to the existing supply of such land," OAR XXX-XXX-XXXX, in order to provide a reasoned basis for planning, OAR XXX-XXX-XXXX. To accomplish that comparison, a city's EOA must (1) identify types of industrial or other "employment uses" that, based on trends, are projected to locate or expand in the city, and (2) specify the number of sites that are needed to accommodate such uses. OAR XXX-XXX-XXXX. The dispute in this case involves the parties' differing interpretations of the rule for classifying sites. That rule provides that the EOA "must identify the number of sites by type reasonably expected to be needed to accommodate the expected employment growth based on the site characteristics typical of expected uses." OAR XXX-XXX-XXXX(2) (emphasis added). Thus, for example, if a city projects that 10 warehouses will be needed to accommodate projected job growth, the EOA will specify that it projects the need for 10 sites that have "site characteristics" that are "typical of" warehouses (for example, large size, access to major highways, etc.).
Complicating matters, however, OAR XXX-XXX-XXXX(11) provides that "site characteristics"
"means the attributes of a site necessary for a particular industrial or other employment use to operate. Site characteristics include, but are not limited to, a minimum acreage or site configuration including shape and topography, visibility, specific types or levels of public facilities, services or energy infrastructure, or proximity to a particular transportation or freight facility such as rail, marine ports and airports, multimodal freight or transshipment facilities, and major transportation routes."
(Emphasis added.) Thus, while OAR XXX-XXX-XXXX(2) refers to site characteristics that are "typical of" certain uses, OAR XXX-XXX-XXXX(11) provides that a site characteristic is a characteristic that is necessary for such uses. Therein lies the dispute. As petitioner explains:
"`Site characteristics' are important because they define what existing urban land can be used to accommodate economic growth. If a site characteristic such as minimum acreage is defined broadlyfor example if one assumes that an industry needs 50-acre contiguous parcelsexisting urban land is less likely to suffice, and the EOA will suggest expanding the Urban Growth Boundary to urbanize more farmland. If, on the other hand, site characteristics are defined narrowly, to include only what an industry actually needs in order to operate, existing urban lands are more likely to accommodate that development."
To illustrate, presume that a warehouse absolutely cannot exist unless it is on a site that is at least two acres, yet, typically, warehouses not only need two acres, but they also need level ground and access to major highways. It is more likely that qualifying sites are available within the Urban Growth Boundary if the only criterion for such sites is that they contain two acres, than it is if the criteria also include level ground and access to major highways.
Petitioners therefore focus on the word "necessary." They argued before the Newberg city council, and then to LUBA, that, under the ordinary definition of the word "necessary," a site characteristic must be something "that cannot be done without" or that "must be had" in order for an industrial or other employment use to operate. See Webster's Third New Int'l Dictionary 1511 (unabridged ed. 2002). The city, however, argued that it could adopt as site characteristics those attributes that would give the city a competitive advantage with respect to attracting industrial and employment uses.
LUBA rejected both petitioners' and the city's respective interpretations of the term "site characteristics." LUBA explained:
"Applying [the ordinary methodology for interpreting administrative rules] here, the text of OAR XXX-XXX-XXXX(11) itself suggests [the Land Conservation and Development Commission (LCDC)] did not intend that a site characteristic must be an attribute that cannot be done without or an attribute that must be had. OAR XXX-XXX-XXXX(11) includes a non-exclusive list of examples. Given a properly motivated *769 developer, it is hard to see how a specific site `shape' or `visibility' could ever be an attribute that could not be done without. Perhaps more importantly, both petitioners and the city ignore the language in OAR XXX-XXX-XXXX(2), quoted above, which is the rule that actually requires the city to identify sites based on site characteristics. OAR XXX-XXX-XXXX(2) directs that identification of needed sites is to be `based on the site characteristics typical of expected uses.' (Emphasis added.) The choice of the word `typical' in OAR XXX-XXX-XXXX(2) strongly suggests that LCDC intended the word `necessary' in OAR XXX-XXX-XXXX(11) to mean something other than `cannot be done without.' While `typical' attributes would presumably include those attributes that are absolutely necessary to construct and operate a business, `typical' attributes would also likely include those attributes that while not `necessary,' in the dictionary sense of the word, are nevertheless typically required for a business to operate successfully."
LUBA continued:
"If the words `attributes of a site necessary for a particular industrial or other employment use to operate,' in the definition of `site characteristics' are viewed in context with the language of XXX-XXX-XXXX(2), we believe that site characteristics are properly viewed as attributes that are (1) typical of the industrial or employment use and (2) have some meaningful connection with the operation of the industrial or employment use. If the record demonstrates that an attribute is both typical and has some meaningful connection with the operational requirements of the industrial or employment use, we believe OAR XXX-XXX-XXXX(11) and XXX-XXX-XXXX(2) would permit the city to list it as a site characteristic. OAR XXX-XXX-XXXX(11) and XXX-XXX-XXXX(2) do not require that the city go further, as petitioners argue, and demonstrate that the site characteristic is essential, in the sense it would not be possible to construct or operate the industrial or employment use without the attribute."
(Emphasis added.)
LUBA then considered the revised EOA in light of that understanding of the administrative rules and determined that the "short findings and the material in the record cited by the city are simply not sufficient to establish that the [challenged] siting standards * * * are `typical' of the industries the city seeks to attract. Additional findings and perhaps additional evidence will be required to make that demonstration."
Petitioners are not satisfied with LUBA's remand to the city. In their petition for judicial review, they contend that LUBA's test-that is, whether the site characteristic is "typical" and has "some meaningful connection" to the use-effectively "reads the `necessity' requirement out of the rule * * *." They further contend that there is no evidence in the record that the challenged site characteristics meet that more stringent standard ("cannot be done without"), and they urge us to send the case back to LUBA with instructions to reverse the city's decision.
We review LUBA's decisionmore specifically, its construction of the administrative rule at issue, OAR XXX-XXX-XXXX(11)to determine whether the decision is "unlawful in substance." ORS 197.850(9)(a); Stewart v. City of Salem, 231 Or.App. 356, 358, 219 P.3d 46 (2009), rev. den., 348 Or. 415, 233 P.3d 818 (2010). Our objective is to determine the intent of LCDC, the body that promulgated the rule. Wetherell v. Douglas County, 235 Or.App. 246, 256, 230 P.3d 976, rev. den., 349 Or. 57, 240 P.3d 1098 (2010) (quoting State v. Papineau, 228 Or.App. 308, 311, 208 P.3d 500, rev. den., 346 Or. 590, 214 P.3d 822 (2009)). In making that determination, we use the same methodology used to interpret a statute, starting with an examination of the text of the rule in context. Wetherell, 235 Or.App. at 256-57, 230 P.3d 976.
Here, as set out above, the parties' dispute centers on the meaning of the term "necessary" as it appears in the phrase "attributes of a site necessary for a particular industrial or other employment use to operate * * *." OAR XXX-XXX-XXXX(11). Petitioners urge us to use the Webster's dictionary definition, whereas the city defends LUBA's two-pronged *770 "typical plus some meaningful connection" test.
Although "necessary" is commonly used to denote something "indispensable," the word has long proved more elastic in legal parlance. Nearly a century ago, in State v. Young, 74 Or. 399, 406, 145 P. 647 (1915), the Oregon Supreme Court observed:
"The word `necessary' must be construed in the connection in which it is used. It is a word susceptible of various meanings. It may import absolute physical necessity, or that which is only convenient or useful or essential: 5 Words and Phrases, p. 4705. The courts have many times construed the word `necessary,' and it has almost universally been held to mean needful or convenient; especially is this the case where the word is used in conjunction with other and stronger terms."
Little has changed since Young to make the term "necessary," so far as it appears in statutes or administrative rules, any less ambiguous when read in isolation. As Black's Law Dictionary 1029 (6th ed. 1990) explains,
"This word must be considered in the connection in which it is used, as it is a word susceptible of various meanings. It may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought. It is an adjective expressing degrees, and may express mere convenience or that which is indispensable or an absolute physical necessity. It may mean something which in the accomplishment of a given object cannot be dispensed with, or it may mean something reasonably useful and proper, and of greater or lesser benefit or convenience, and its force and meaning must be determined with relation to the particular object sought."
(Emphasis added.)[1]See, e.g., 1000 Friends of Oregon v. LCDC (Lane Co.), 305 Or. 384, 395, 752 P.2d 271 (1988) (noting that "historic battles were fought over the meaning of `necessary' in the United States Constitution") (citing McCulloch v. Maryland, 17 U.S. 316, 4 Wheat. 316, 4 L.Ed. 579 (1819) (national bank could be considered "necessary" within the meaning of "necessary and proper" clause of Article I, section 8, of the United States Constitution)); State ex rel. Dept. of Rev. v. Capital Shelters, 295 Or. 561, 563, 668 P.2d 1214 (1983) ("The term `necessary,' as contained by the statute [ORS 305.190], means relevant to the purposes of a lawful investigation and the object of a demonstrable, practical need."); Moore Mill & Lbr. Co. v. Foster, 216 Or. 204, 235, 336 P.2d 39 (1959) ("It is our belief that the word `necessary,' as used in Art. I, § 18, means `reasonably necessary' as that term is employed in ORS 376.510. We further believe that the meaning of the term `reasonably necessary' is indicated with sufficient clarity by its context."); In re Feehely's Estate, 182 Or. 246, 256, 187 P.2d 156 (1947) ("Litigation is necessary, in the sense of the [statutory phrase "necessary litigation"], if it is reasonable, useful and proper."); Oregon Shores v. Oregon Fish and Wildlife, 62 Or.App. 481, 490-91, 662 P.2d 356, rev. den, 295 Or. 259, 668 P.2d 381 (1983) (holding that the term "necessary" expresses "non-completed legislation" that could be interpreted as "reasonably necessary" rather than "indispensable"); cf. J.R. Simplot Co. v. Dept. of Agriculture, 340 Or. 188, 197-98, 131 P.3d 162 (2006) (the phrase "reasonably necessary to cover the cost of inspection and administration" is an "`inexact term' that expresses a complete legislative policy").
In other words, context is critical in determining whether the word "necessary" means "indispensable" (as petitioners contend) or something less stringent, such as "reasonably necessary" or "useful" or "convenient." Thus, we turn to the relevant context in which the definition of "site characteristics," including the word "necessary," appears.
The definition of "site characteristics" at issue is part of Division 9 of LCDC's administrative rules. "The intent of [Division 9] is *771 to link planning for an adequate land supply to infrastructure planning, community involvement and coordination among local governments and the state." OAR XXX-XXX-XXXX. "The purpose of this division is to implement Goal 9, Economy of the State (OAR XXX-XXX-XXXX(9)), and ORS 197.712(2)(a) to (d)." Id.
Those cited provisions of the implementing statute, ORS 197.712(2), state:
"By the adoption of new goals or rules, or the application, interpretation or amendment of existing goals or rules, the Land Conservation and Development Commission shall implement all of the following:
"(a) Comprehensive plans shall include an analysis of the community's economic patterns, potentialities, strengths and deficiencies as they relate to state and national trends.
"(b) Comprehensive plans shall contain policies concerning the economic development opportunities in the community.
"(c) Comprehensive plans and land use regulations shall provide for at least an adequate supply of sites of suitable sizes, types, locations and service levels for industrial and commercial uses consistent with plan policies.

"(d) Comprehensive plans and land use regulations shall provide for compatible uses on or near sites zoned for specific industrial and commercial uses."
(Emphasis added.)
In general terms, the identification of "site characteristics" is one of the steps in determining whether the local government's comprehensive plan includes land "suitable" to meet the number of "sites needed to accommodate industrial and other employment uses to implement plan policies." OAR XXX-XXX-XXXX(1) ("The plan must identify the approximate number, acreage and site characteristics of sites needed to accommodate industrial and other employment uses * * *."); OAR XXX-XXX-XXXX(2) ("Plans must designate serviceable land suitable to meet the site needs identified in section (1) of this rule."). For purposes of Division 9, LCDC defines "suitable" to mean "serviceable land designated for industrial or other employment use that provides, or can be expected to provide the appropriate site characteristics for the proposed use." OAR XXX-XXX-XXXX(12).
In that statutory and regulatory context, we agree with LUBA that "site characteristics" need not be "indispensable" to a particular use in order to be "necessary for a particular industrial or other employment use to operate." The intent of Division 9 is to ensure that there is an "adequate supply of land for economic development and employment growth in Oregon," OAR XXX-XXX-XXXX, which is vital to the health, welfare, and prosperity of the state. See ORS 197.712(1) (finding and declaring that "the provision of adequate opportunities for a variety of economic activities throughout the state is vital to the health, welfare and prosperity of all the people of the state"). That overriding intent to allow and plan for anticipated economic growthin part, through the identification of "site characteristics" that make the land "suitable" to meet the needs of anticipated growthsuggests something other than petitioners' strict "indispensability" test that would take into consideration only those "site characteristics" without which particular industry and employment uses could not operate. Rather, the planning scheme (based on projections and economic trends) suggests, as LUBA adopted, a more pragmatic approach toward accommodating economic growth: That "necessary" site characteristics are those attributes that are reasonably necessary to the successful operation of particular industrial or employment uses, in the sense that they bear some important relationship to that operation. In our view, LUBA's formulation of the relevant inquiry adequately captures the concept of reasonable necessity that is embodied in the rule. Accordingly, we conclude that LUBA did not err in rejecting petitioners' proffered dictionary definition of the term "necessary," given the context in which that term appears.[2]
*772 As noted above, LUBA articulated the relevant "site characteristic" test as involving two prongs: (1) that the attribute be "typical of the industrial or employment use" and (2) that it have "some meaningful connection with the operation of the industrial or employment use." The first of those prongs, that the attributes be "typical," appears expressly in OAR XXX-XXX-XXXX(2), which refers to "site characteristics typical of expected uses." Petitioners do not challenge that aspect of LUBA's remand, and we do not discuss it further.
Affirmed.
NOTES
[1] Indeed, later editions of Black's Law Dictionary have abandoned any effort to offer a singular definition of the word "necessary," instead defining it only with respect to particular terms or phrases in which it is used. See, e.g., Black's Law Dictionary 1130 (9th ed. 2009) (separately defining terms such as "necessary and proper," "necessary damages," "necessary deposit," "necessary diligence," "necessary inference," "necessary party," and "necessary repair").
[2] Indeed, as LUBA pointed out, the second sentence of the definition of "site characteristics" includes "shape" and "visibility," OAR XXX-XXX-XXXX(11), attributes that, although important to industrial and employment uses, would not normally be considered "indispensable"further contextual support that cuts against petitioners' dictionary definition of the term "necessary."